IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBERT AND REBECCA ORGAIN, et. al. ) ) ) | |
| v.   ) | CIVIL ACTION NO. L-02-2797 |
| ) | |
| CITY OF SALISBURY, MARYLAND ) et. al.   ) | |

**PLAINTIFFS' OPPOSITION TO (1) DEFENDANTS' REQUEST TO TAKE JUDICIAL NOTICE OF FACTS; (2) DEFENDANTS' MOTION TO STRIKE VARIOUS EVIDENCE AS IRRELEVANT OR HEARSAY; (3) REQUEST FOR A HEARING ON DEFENDANTS' MOTION**

**I. OVERVIEW**

On May 8, 2006, some of the above captioned defendants (the City of Salisbury, Chief Allan Webster and Wicomico County, collectively defendants) filed a Reply in Opposition to Plaintiffs' Response to all Defendants' Motion for Summary Judgment. Defendants' also ask the court to exclude as irrelevant evidence of the police force's racially motivated adverse conduct towards Andromeda's African American customers. Finally, Defendants erroneously characterize as hearsay Freedom Ford's statements regarding Detective Tucker's suggestion to Ford that the club change its format from hip hop to country western.

Accordingly, Plaintiffs Robert and Rebecca Orgain and M31 Andromeda (collectively Orgains or Plaintiffs) by and through undersigned counsel, CAROLYN ELEFANT, LAW OFFICES OF CAROLYN ELEFANT, hereby file this consolidated response in opposition to (1) Defendants' request for judicial notice and (2) Defendants' motion to strike evidence as irrelevant or hearsay. We emphasize that this response is not intended as a sur-reply, but rather, as opposition to requests made by Defendants that are in the nature of motions and thus, entitle

1

Plaintiffs to a response. In addition, Plaintiffs ask this court to convene a hearing on Defendants' Motion for Summary Judgment in light of the complexity of the record, the unique nature of these type of selective enforcement claims and the substantial financial impact of a dismissal on Plaintiffs.

## II. ARGUMENT

A.  **Judicial Notice That "Shootings are Serious" Is Not Appropriate Where The Record Contains Evidence to the Contrary**

   **1. Under FRE 201, Disputed Facts Are Not Eligible for Judicial Notice**

Judicial notice is governed by Rule 201 of the Federal Rules of Evidence. Rule 201(b) provides:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Rule 201(e) affords a party "an opportunity to be heard as to the propriety of taking judicial notice." By this oppositions, Plaintiffs exercise our right to hearing on Defendants' judicial notice request.

   **2. Defendants' Request for Judicial Notice of the Seriousness of Shooting Fails the Rule 201 Criteria**

Defendants invite the court to take judicial notice that shootings are serious (Response at 8).[1] The seriousness of a shooting in this case is a hotly disputed fact that must be resolved by a

---

[1] It appears that Defendants use the term "shooting" to refer to both "shots fired incidents" and shootings. Citing Salisbury Police Detective Tucker's testimony, Plaintiffs explained in our Opposition that "shots fired" (*i.e.*, a gun incident where no one is physically hit) is a less serious incident, on the level of an assault. Tucker, P-Exh. 17, Lines 14-18. Earlier in

2

jury, not judicial notice.

Defendants try to ignore the dispute over the seriousness of gun incidents by suggesting that only Plaintiffs regarded the incidents as not serious. Defendants' Opposition at 8. But this is not Plaintiffs' opinion; rather, it was Salisbury Police Detective Tucker who testified that a "shots fired incident" is less serious, on the level of an assault." Plaintiffs' Response at 19. Moreover, "shots fired" or even shootings were not the only incidents that Webster regarded as serious. Webster used a specific term of art, *i.e.*, "violence related calls" to describe the types of calls that he considered serious or worthy of concern. Plaintiffs' Opposition at 9-10. According to Chief Webster, violence related calls include assaults, fights, disorderly conduct, domestic disturbance, other disturbance, firearms, weapons and threats. [Exh. 2, Webster 20, 37].[2] Violence related calls have a potential for someone to be injured or for an arrest to occur. *Id* at 21.

Counsel for the Defendants may not consider a fight, disorderly conduct or the rampant assaults at Brew River as "serious" as a "shots fired," but the evidence shows that Chief Webster did inasmuch as he classified all of these incidents as violence related. *C.f., Zeigler v. Jackson*, 638 F.2d 776 (5th Cir. 1981)(finding that under applicable Department rules, terminated officer's offense of presenting a weapon is no more serious than misdemeanors committed by other officers who were not termiated). Thus, a jury could reasonably wonder why Webster went after

---

his testimony, Tucker *volunteered* that the January 2, 2002 incident was "classified as a shoots fired. A shooting we classified it if somebody was actually hit. But a shoots fired incident, we would classify it that way." *See* Attachment 1, attached.

[2]Plaintiffs' tables analyzing numbers of violence related calls apply Webster's own definition. See P-Exh. 48.

Andromeda with threats of nuisance prosecution, failed to extend assistance to the club from Community Affairs and sent copies of correspondence to the Orgains to the Mayor and the States' Attorney whereas he did not do so with Brew River. The record indisputably shows that under Webster's criteria for violence related calls, Brew River had more than Andromeda. P-Exh. 48, 49, 50. And, the record contains a material dispute of fact over the seriousness of a shots fired incident which Webster now cites as his rationale for treating Brew River and Andromeda differently (notwithstanding that at the time the August 10, 2001 letter was sent, there is serious question about whether Andromeda even had a single shots fired episode). The City cannot continue to cite the alleged seriousness of shots fired to distinguish the heavy handed treatment inflicted on Andromeda and the "turn a blind eye courtesy" extended to Brew River.[3]

In seeking judicial notice of the seriousness of shootings, Defendants seem to believe that these incidents are capable of evaluation against some uniform standard. In fact, the seriousness of the incidents depend entirely on context. In a suburban area of Montgomery County, Maryland, a single shot fired would be regarded as extremely serious because of its infrequent

---

[3] In addition, as Plaintiffs emphasized in our original brief, Defendants cannot cite shots fired incidents to justify conduct that pre-dated the gun incidents. Opposition at 37-38. For example, Webster sent his first threatening letter to Plaintiffs on August 10, 2001 (which was copied to the Mayor and the States Attorney and did not ask the Orgains to contact Community Affairs) even though at that time, the only evidence of a gun incident was the August 9, 2001 police report of a bullet hole in a car reported 14 hours later, ample time for a hole to have been made elsewhere. Also, Mr. Orgain was present at the club that evening and he disputes that shots were fired and then wrote to Webster on August 20, 2001 and disputed the number of CFS (at the time, the Orgains could not address the August 9 issue because they did not even know about the police report of a bullet hole). *Id*. Defendants do not explain what justified threats of nuisance charges, publication of the incident to the Mayor, Board and States Attorney and no offer of assistance - when the February 7 letter sent to Brew River did not. And even when the January letter was sent, only 2 shots fired incidents had taken place at that time (which Plaintiffs maintain were the first) and which Tucker (who investigated the first incident) did not believe were serious. P-Exh. 43 and *supra*.

and unexpected nature. For soldiers serving in Iraq, even a full round of shots fired in the middle of night most likely brings a sigh of relief that a bomb did not explode, rather than any fear or concern.

Within the City of Salisbury, the reality is that violence and gun incidents occur with frequency. As noted in Plaintiffs' Opposition, City Police responded to a total of 37,000 CFS in 2001 and again in 2002. Plaintiffs' Opposition at 3. More to the point, Defendants also produced in discover a summary list of CFS between April 1, 2001 and December 31, 2002, showing 45 firearm assaults and 25 firearm related robberies (p.1), 81 CFS for Man with a Gun (p. 2) and 88 firearms incidents (p. 3).[4] In this context, the three shots fired incidents and one shooting that took place at Andromeda over a ten month period hardly seem worthy of note, much less entitled to judicial notice that they constitute serious incidents.

Finally, even if the court were to judicially notice Defendants' proposition that shootings are serious, ultimately, this finding would not change the outcome of the case. Simply finding that shootings are serious does not detract from Webster's belief that other "violence related crimes" such as assaults, fights, disorderly conduct, are serious. Thus, such a finding would not resolve the material dispute of fact such as whether Brew River and Andromeda are similarly situated and were entitled to similar treatment or whether Webster's harsher treatment towards Andromeda was racially motivated or justified by public safety concerns.

Based on the foregoing argument, the court should DENY Defendants' request to take judicial notice that shootings are serious.

**B.  The Evidence Presented By Plaintiffs Regarding Disparate Police Treatment of**

---

[4] *See* Attachment 2, CFS, Salisbury Police Department (3/1/01 - 12/31/02).

5

**Andromeda Customers and Other Racially Motivated Comments Are Relevant**

Defendants ask the court to disregard all evidence of racially discriminatory actions or statements by other officers, arguing that none of this evidence is relevant to demonstrate that Chief Webster intentionally discriminated based on race absent evidence that Webster was aware of or directed the actions. Defendants' Reply at 2-3. Defendants do not cite any caselaw to support this "knew or directed" standard, so Plaintiffs can only guess at its source. But typically, the "knew or directed" standard applies in cases involving allegations of vicarious liability.

By contrast, Plaintiffs do not claim that Webster individually or the City (which is the same as Webster in his official capacity) are vicariously liable for racially discriminatory conduct by officers; *Monell* precludes this line of argument. Rather, we argue that the racially discriminatory conduct of the Salisbury police force[5] sheds light on Webster's motive in targeting Andromeda. Put another way, Plaintiffs do not argue that Webster or the City are liable "by proxy" for the racially motivated conduct of the police force but that Webster himself (either in individual capacity or as a City official) acted with discriminatory intent, (and not public safety concerns as claimed), intent which can be discerned at least in part by the racist conduct that pervaded the police force and indeed the entire community. The Fourth Circuit has held that evidence of "a general atmosphere of discrimination" can be considered relevant to ascertaining the decision maker's intent. *Williams v. Hansen*, 326 F.3d 569, 585 (4th Cir.

---

[5]*See* Plaintiffs' Opposition 8-17 for first hand testimony on this disturbing conduct from at least seven witnesses, including the Vice President of the local NAACP Chapter, all of which Defendants dismiss wholesale as "speculation and innuendo." Defendants' Reply at 4. Conduct included interrogation of patrons, an ominous police presence outside the club intended to intimidate patrons rather than deter crime, racial epithets and rude attitude, none of which was present at Brew River or other clubs serving white patrons.

2003)(allowing consideration of history of discrimination within jurisdiction to show racial motivation); *Mullen v. Princess Anne Volunteer Fire Company,* 853 F.2d 1130 (4th Cir. 1988) (admitting evidence of discrimination in community to show decision makers' racially motivated intent); *accord Warren v. Halstead Industry*, 802 F.2d 746 (4th Cir. 1986) (evidence of atmosphere of discrimination in employment context).

Moreover, in every one of the factually similar case cited by Plaintiffs Opposition at 50-51, the court considered similar patterns of racially motivated conduct by the police force -- notwithstanding that the Police Chief (or other law enforcement official, *e.g.,* Sheriff) and the City were the only named defendants in the case. These courts found the actions of the police force probative of either a racially discriminatory policy and practice or discriminatory intent by the police chief. These courts did not require the plaintiffs to sue every individual officer who participated in a picket line or interrogated an African American customer, nor did they require the plaintiffs to prove that the named Police Chief had direct knowledge of the practices of the police force. Defendants do not attempt to distinguish any of those cases or give any reason as to why the rationale used by those courts do not apply here.

As in all of these other cases, *supra*, evidence of the racially motivated conduct of the Salisbury City Police towards patrons and the generally discriminatory attitudes within the community all point to racial discrimination as Webster's motive behind his overly harsh, punitive conduct towards the black club Andromeda and not the similarly situated white club, Brew River. Accordingly, the court must DENY Defendants' request to exclude these actions

from evidence.[6]

**C. Tucker's Statement to Ford that Andromeda Should Change Its Format Is Not Hearsay**

Defendants argue that Tucker's statement to Freedom Ford that Andromeda should change its hip hop format to country to bring a better element Western is both inadmissible as hearsay and irrelevant. Defendants are wrong on both counts.

As to the hearsay, Tucker made the statement regarding the change of format directly to Ford during the course of investigating the January 2 shots fired incident. The statement is not hearsay because Ford personally testified to what he heard Tucker say. Put another way, the

---

[6]Defendants argue that various other evidence is irrelevant as well, often taking the evidence out of context and suggesting that Plaintiffs have used it to prove racial discrimination when in fact, the evidence was intended for another purpose. For example, in footnote 7, Defendants argue that Plaintiffs' complaint that many incidents at Andromeda were reported after the fact is not relevant to racial discrimination. (Plaintiffs identify the after the fact reports in Exh. 48; they are also evident from the descriptions in the Blotter at 50. There were at least 4 violence related CFS reported after the fact that Plaintiffs identified in P-Exh. 48, Table I as well as others that Mrs. Orgain included in her notes in P-Exh. 47A. In any event, Plaintiffs made the point about "after the fact" reports because Defendants claimed that Plaintiffs had not been responsive to Chief Webster's August 10 letter and Plaintiffs attempted to explain that the reason for that was because calls were reported after the fact and the information was never conveyed to the Orgains. Where CFS were made at the time they occurred, the Orgains or staff were present at the club and made aware of the calls. Because the Orgains did not know about many calls, because they were reported after the fact, or occurred after the complainant or victim had left the club, they had no way of knowing they had a problem which is why they did not take Chief Webster's first letter seriously. As Mrs. Orgain stated in her affidavit, the Orgains would have acted differently had they known that the first letter was going to count as a strike against them later. The point here is that the after the fact calls are not intended to show racial discrimination but to give context to the facts and also to show that Webster's targeting of the Orgains was unreasonable given that he held them accountable for calls that they simply were not aware of.

Given that there are simply too many situations where Defendants claim evidence is irrelevant to race discrimination when in fact, Plaintiffs presented the evidence for another reason, Plaintiffs cannot find a way to respond to every one. Instead, we will stand on the explanations of the evidence provided in our Opposition.

statement is not "second hand," and thus, does not constitute hearsay.

The statement is also relevant in that it evinces racial intent because of the close association between hip hop and African Americans. *See* Plaintiffs Opposition at 43. Although Webster did not make this statement, Habash testified that both Webster and Davis told Habash to change his hip hop format to country western. The specific testimony by Tucker to Ford and then Webster and Davis to Habash regarding "hip hop to country western" is so unique (the testimony was not to get rid of hip hop or change to oldies, but in all cases, to change from "hip hop to country western") that it reflects a policy common to the department and known to Webster. Thus, even Tucker's statement is relevant to proof of racially discriminatory intent by Webster. *See also* Plaintiffs' Opposition 43-44.

Accordingly, the court should REJECT Defendants' claim that Tucker's advice to "change from hip hop to country western" is inadmissable as hearsay or irrelevant evidence.

## D.  Request for a Hearing

The court has already been inundated with hundreds of pages of briefing and exhibits in this case. Plaintiffs believe that a hearing would provide the most expeditious way for the parties to hone in on the issues that are of interest or concern to the court. Moreover, the stakes in this case are high for both parties: Plaintiffs face a substantial financial loss; as for Defendants, the outcome of this case may bear one way or another on the related, pending matter *Habash v. City of Salisbury* where the City and Webster are also defendants. Finally, the court must address the first impression issue of whether the Board of License Commissioners is a state agency for purposes of Eleventh Amendment immunity and a hearing can shed light on those issues as well. For these reasons, Plaintiffs ask the court to GRANT our request for a hearing on

9

Defendants' Motion for Summary Judgment.

### III.  CONCLUSION

WHEREFORE, Plaintiffs request that the court (1) DENY the request for the court to take judicial notice that shootings are serious; (2) DENY Defendants' request to exclude as irrelevant evidence of the police force's racially motivated conduct; (3) DENY Defendants' request to exclude as hearsay or irrelevant Tucker's statement to Ford that the club should change from hip hop to country western and (4) GRANT Plaintiffs' request for a hearing.

Respectfully submitted,

/s/ (electronic signature)

Carolyn Elefant Bar No. 26862
LAW OFFICES OF CAROLYN ELEFANT
1717 K Street, N.W.  Suite 600
Washington D.C.  20036
202-297-6100
loce@his.com

Dated May 14, 2006
Washington D.C.

## CERTIFICATE OF SERVICE

I certify that I have complied with the electronic filing rules of the court in filing this document, with notice to be made electronically to counsel.

/s/
_____
**Carolyn Elefant**