IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Robert and Rebecca ORGAIN, et. al.          :
                                            :
                                            :
v.                                          :
                                            :          CIVIL NO. L-02-2797
                                            :
CITY OF SALISBURY, et al.                   :

MEMORANDUM

Pending in this civil rights case are the Motions for Summary Judgment filed by

Defendants.[1] The parties have fully briefed the issues, and the Court held a three-hour oral

argument on December 16, 2006.  For the reasons set forth below, the Court will, by separate

Order, (i) GRANT Defendants' motions, (ii) ENTER JUDGMENT in their favor, and (iii)

DIRECT the Clerk to CLOSE the case.

## I.    Introduction

In this civil rights suit, the owners of a now defunct nightclub located in Salisbury,

Maryland contend that city and county officials drove them out of business.  Plaintiffs allege that

Defendants subjected the club to heightened police scrutiny and suspended their liquor license

because they hosted "hip hop" nights that attracted a largely black clientele.  In order to

withstand summary judgment, the owners were required to produce evidence from which a fair-

minded jury could find that the laws were selectively enforced against them.  This they have not

done.

---

[1]      As is detailed in section II.B.1, infra, the Defendants are: the City of Salisbury,
Salisbury Police Chief Allan J. Webster, Wicomico County, the Board of License
Commissioners of Wicomico County, and the individual members of the Board (Leo McNeil,
W.C. Holloway, and Shirley C. Gray).

## II.      Background

### A.  Facts

In March 2000, Plaintiffs Robert and Rebecca Orgain, who are white, borrowed $750,000

to build a nightclub, Andromeda, in Salisbury.[2]  Andromeda was a large club, with 13,000 square

feet of floor space and an occupancy limit of 750 persons.  According to the club's business

model, Andromeda needed to attract 308 persons a night (each spending $20) three nights a week

in order to break even.  Because the club did not have a restaurant, it relied on liquor sales for

most of its revenue.[3]

The Orgains obtained the necessary permits, including a liquor license, and

opened for business on October 25, 2000.  The club was located in a section of Salisbury zoned

light industrial, and was open at least four nights a week.  The club offered both live bands and

Disc Jockeys ("DJs").  Each night had a different theme.  Initially, Wednesday, which was

Ladies Night / Hip Hop Night, proved to be the most popular and drew a crowd that was

predominantly, though not exclusively, black.

Andromeda soon became a trouble spot for the Salisbury Police Department ("SPD," or

"the Department").  By August 10, 2001, the police had received fifty-eight Calls for Service

("CFS," or simply "Calls") concerning incidents at or near the club.[4]  Some of the Calls were for

---

[2]      Salisbury, a city of just under 24,000 people located on Maryland's Eastern
Shore, is the county seat of Wicomico County.

[3]      The club did impose a "cover charge" for admission, but its principal source of
income was from liquor sales.

[4]      According to the Salisbury Police Department website, a Call for Service is "an
event occurring in or near the City of Salisbury to which one or more Salisbury Police employees
must respond or take action, or an event that comes to the attention of police or is initiated by
police that requires formal documentation (an offense report, supplemental report, or accident
report)."  Definition of "Call for Service," http://www.salisburypd.com/FAQ/faq.html (last
visited June 5, 2007).

petty offenses, such as vandalism.  Many of the Calls, however, were more serious and involved assaults, thefts, disorderly conduct, and reports of gunshots.

On August 9, 2001, police took a report concerning a fight and a gunshot in Andromeda's parking lot.[5]  This incident, together with the heavy CFS traffic, prompted Salisbury Police Chief Allan J. Webster to write the Orgains a warning letter.  Noting that twenty-six of the Calls were "violence related," Chief Webster threatened that he would "explore violations of the nuisance law" if the Orgains did not maintain better order at the club.

Wicomico County's alcohol-serving establishments are policed by the county's Alcohol Task Force.  On November 9, 2001, plain-clothed Task Force members visited Andromeda for a spot check.[6]  Officer Jeff Maslona spotted several underage women dancing on a stage.[7]  When the women spotted Maslona, they ducked out a back door.

The officers eventually located the five women, all aged 20, who admitted that they had used three false New Jersey driver's licenses to enter the club.[8]  When Maslona checked the IDs, he saw that the licenses had expired, were issued to other persons, or were, in his words,

---

[5]     On the evening of August 9, 2001, McKinley Hayward, an Andromeda patron, came to the police station to report that a fight had taken place near his vehicle, which he had parked in the club's parking lot.  Hayward stated that he "heard a gunshot."  Sometime after Hayward left the club, he discovered a bullet hole in his car's rear hatch and the bullet itself in the passenger compartment.  See Mem. Def. Mot. Summ. J., Exh. 10

[6]     November 9, 2001 was a Friday, which was not a hip hop night at Andromeda.

[7]     None of the Task Force members that night were from the SPD.

[8]     The women entered the club in two groups.  After the first group gained entrance, one of the women passed the IDs to the second group, which had remained outside.  The second group then used the IDs to enter.

"obviously fake." The women agreed to provide breath samples. Their BACs ranged from .04 to .10.[9]

The officers cited the Orgains for five counts of allowing an under-aged person to be on the premises, and five counts of serving alcohol to an under-aged person.[10] The Wicomico County Board of License Commissioners ("the Board"), which oversees the County's alcohol-serving establishments, issued a show cause order that summoned the Orgains to appear for a hearing on the charges.[11]

The hearing was held on December 13, 2001. As is their custom, all three members of the Board sat as a panel. Officer Maslona testified concerning the spot check, his discovery of the women, and his subsequent investigation.

The five underage women then testified.[12] Three of them stated that an Andromeda doorman had "chuckled" over the amateurish quality of the identifications. One woman stated that she went to Andromeda because she had heard that it was "easy for girls to get into the club even if you are underage." Another woman testified that she had consumed "five to six shots and three or four or maybe five beers" during an hour and a half at the club.

---

[9]     Had the women been driving, all would have been guilty of driving under the influence or driving while intoxicated. See Md. Code Ann., Cts. & Jud. Proc., § 10-307 (West 2007).

[10]     See Md. Code Ann. Art. 2B §§ 6-401(x)(6) & 12-108(c)(vi)(2) (West 2007).

[11]     The Commissioners are Leo McNeil, W.C. Holloway, and Shirley C. Gray. Chairman McNeil is black. The trial transcript indicates that McNeil has been a Commissioner for 18 years. On deposition, Holloway testified that he was appointed as a Commissioner in 1995. The record does not reflect how long Gray has served.

[12]     The Board tape-recorded the hearing and a transcript was prepared. See Mem. Def. Mot. Summ. J., Exh. 19. The testimony of the underage women appears at pp. 15-27.

The Orgains, who were represented by counsel, then testified.[13]  Robert Orgain stated that it was the club's policy to deny access to anyone who failed to present a valid identification.[14] He described the club's efforts to enforce that policy.[15]  He explained that checking IDs is problematic because of the high quality of the phonies, and that he had already scheduled an additional ID training session for his security staff.  Rebecca Orgain testified that the club had recently hired a security chief whose "forte" was uncovering false identifications, but who, unfortunately, was not on duty the night of the incident.

After the evidence had been taken, the Board opened the floor for comment.  Chairman McNeil, who is black, acknowledged that detecting fake IDs was often difficult, but that he expected a club's doorman to look at expiration dates.  Greg Rickards, the Board's Chief Inspector, stated that in his view it was the doorman's responsibility to check questionable licenses against the published guide to state IDs.  At no point in the hearing was hip-hop or the racial composition of Andromeda's clientele mentioned.

The Board adjourned without making a decision.  On December 17, 2001, the Board found the Orgains guilty of ten violations of Maryland's liquor laws, fined them $5,000, and suspended their license for five days.  Under Maryland law, the Orgains were entitled to appeal

---

[13]     Id. at 27-49.

[14]     Orgain testified that this was the club's first offense, and that the club had recently passed a "cadet check," in which a youthful looking state police cadet had been stopped while attempting to enter the club without identification.

[15]     He also stated that he had purchased a book explaining how to spot phony IDs and a mechanical "reader" that verifies the authenticity of Maryland licenses.  The reader cannot read New Jersey IDs, however, because they lack magnetic strips.

the Board's decision to the Circuit Court for Wicomico County.[16]  The Orgains noted an appeal, but withdrew it on January 15, 2002.  The club served its suspension the week of January 19, 2002, and then reopened for business.

From Andromeda's opening to the January suspension, the club lost money.[17]  To rectify the situation and to capitalize on the popularity of Wednesday Ladies Night / Hip Hop Night, the Orgains hired "an experienced African American promoter" and added a second night of hip hop on Saturdays.[18]  Saturday Hip Hop nights soon became as, if not more, popular than Wednesdays.  Despite the new offering, however, the club was still not attracting enough customers and continued to limp along financially.[19]

The disturbances at Andromeda continued.  Between August 2001 and January 2002, the club generated an additional twenty-six CFS.  Eleven were violence related, including reports of gunfire on January 2nd and January 10th.  In response to the January 10th incident, Chief Webster wrote the Orgains a second letter advising that he intended to seek criminal sanctions against the club.  He had the letter hand-delivered.  Around the same date, Webster informed Salisbury's mayor, Barrie P. Tilghman, of his intent to seek charges against the club for maintaining a public nuisance.  Also around the same time, Major Jeffrey Livingston, Salisbury's Assistant Police

---

[16]     See Md. Code Ann. Art. 2B § 16-101(b) (West 2007).  Thereinafter, the Orgains could have appealed to the Court of Special Appeals, and petitioned the Court of Appeals for a writ of certiorari.  Id. § 16-101(f)(i)-(ii).

[17]     Andromeda finished its first year of operations (from October 20 through December 31, 2000) with a $37,000.00 loss.  See Plfs. Resp. in Opp., Exh. 34.  The club lost $30,800 in calendar 2001.  Id.

[18]     Plfs. Resp. in Opp. 22-23.

[19]     The club did not post a profit until 2002.  That profit – approximately $30,000 from January to June 2002 – fell far short of the projections that the Orgains had submitted to the bank for financing.  Compare Plfs. Resp. in Opp., Exh. 34 with Def. Mot. Summ. J., Exh. 2.

Chief, forwarded a list of Andromeda's CFS to the State's Attorney for Wicomico County. Criminal charges were never filed against the club or the Orgains, however.

On February 10, 2002, an Andromeda patron was robbed inside the club. On May 12, 2002, a patron was shot as he was leaving the club. On May 17th, in response to the shooting and other CFS, the Board issued the Orgains a second order to show cause why their liquor license should not be suspended or revoked.[20] The Orgains received the notice ten days in advance of the hearing. See Md. Code Ann. Art. 2B §10-403(a) (West 2007).

The day before the hearing, Rebecca Orgain contacted Chairman McNeil and requested a postponement because their attorney would not be available until later in the month. McNeil denied the request. The hearing convened on June 4, 2002. Ms. Orgain renewed her request for a continuance, which McNeil again denied. He assured the Orgains, however, that they would have a full opportunity to present their side of the case. He also stated that the Board had not come "with any preconceived notions, no minds have been made up."[21]

Major Livingston, whom the Board had summoned as a witness, testified first. He stated that he was presenting the "police side of the case," meaning the Department's view that repeated disturbances at the club presented a serious law enforcement problem. He testified that from January 1, 2001 to May 2002, the Department had received eighty-two CFS for Andromeda "that we felt were of a violent nature or had the potential for some type of violence."[22] He

---

[20]     Another shots-fired incident occurred on the club's parking lot on May 19, 2002.

[21]     The hearing was again tape-recorded and a transcript was again prepared. See Plfs. Resp. in Opp., Exh. 35.

[22]     Livingston's testimony appears at pp. 5-29. Some CFS from March to May 2002 were unavailable because of a computer virus that had infected the SPD's computer system.

explained that he had "extracted" forty-four calls from this category, each of which he summarized for the Board.

Livingston described Calls relating to fights, disorderly conduct, large crowds, and incidents when gunshots had been fired. His presentation was balanced, however. He volunteered that his sample included several incidents when the police were summoned but the Call was either cancelled or the problem had been resolved before the police arrived. At no time did he mention hip hop or the racial mix of Andromeda's clientele.

The Orgains were given a full opportunity to respond.[23] Rebecca Orgain was conversant with the CFS, and she had previously reviewed most of those that related to the club.[24] In her testimony, she did not contend that any of the Calls were fabricated. Indeed, she said that the club had placed most of the Calls as part of its effort to maintain order. She conceded that the club had been plagued by violence, but she contended that a local criminal element, as opposed to Andromeda customers, was responsible. She testified that the club had taken steps to reduce the number of CFS.[25] She expressed frustration that the incidents kept occurring, because "every time something like that happens we probably lose a few good customers."[26]

Robert Orgain supplemented his wife's testimony. Among other things, he informed the Board that after the May 12th shooting the club had begun barricading its parking lot at closing

---

[23]     Id. at 29-57.

[24]     In advance of the hearing, the Orgains obtained the Department's records concerning a majority of the Calls by filing a Public Information Act request.

[25]     For example, Ms. Orgain explained that the club had hired off-duty police officers from Prince George's County to serve as bouncers and that the club had hired a new, experienced security manager. See, e.g., id. at 38; 49-50.

[26]     She further explained that preserving the peace was in the Orgains' best interests, because she and her husband had begun to market the club for sale.

time.  This measure, he explained, was designed to prevent people bent on causing trouble from

getting near the club when the crowd was letting out.  He insisted that the January 10th shots fired

incident must have involved a "blank revolver," because "[t]here are no bullet holes inside th[e]

building."

The Orgains called their son, Ken Orgain, as a witness.  He testified that in his view "a

lot of problems that happen at th[e] club" were likely caused by "eighteen to twenty-one year old

kids" who "binge drink" and then stir up mischief because there is little else in Salisbury to

occupy them.[27]  The Orgains also called James Fountain Smith, who worked at Andromeda as a

part-time DJ.  Smith pointed out that the club's racial mix was different than that of other clubs,

and then urged the Board to assist the Orgains, to "help them[,] [b]ecause if you don't…you'll

see another increase [at] these other clubs on their calls."[28]

The Board members questioned Ogelsby, who opined that it was the responsibility of

Towards the end of the hearing, the Board invited Assistant Wicomico County State's

Attorney Beau Oglesby to speak.  Oglesby, who was attending the hearing as an observer,

explained that Chief Webster had approached his office for guidance on whether the club could

be prosecuted under the nuisance law.  Oglesby advised the Board that his office had reviewed

Andromeda's CFS, and was prepared to present evidence to a soon-to-be-convened grand jury.

He stated that there was no telling whether the grand jury would indict, but that the degree of

violence warranted a formal investigation.

The Board members questioned Ogelsby, who opined that it was the responsibility of

Andromeda, not the SPD, to maintain order.  He suggested that the club use video cameras as a

security device.  He also stated that he did not see a similar pattern of violence at other county

---

[27]       Id. at 72-73.

[28]       Id. at 70.

establishments.  Oglesby concluded that he "didn't know if it's simply the patrons or the way the establishment is run but there's clearly a problem [at the club] and that's why the State's Attorney's office is here."[29]

The Board then asked for closing comments.  In her closing, Rebecca Orgain insisted that the violence occurring at Andromeda was symptomatic of a larger "community problem."  As proof, she entered into evidence the CFS history for Brew River, a large restaurant/nightclub in Salisbury.  She pointed out that Brew River had logged 134 CFS during a similar period.  She argued that Brew River has having problems even though its owner was highly experienced.  She stated:

> This [Brew River] is a family restaurant and this is a man who has had a lot more experience and is further up on the learning curve than we are and he's having problems too, you know.  And so, you know, that's why I think it's a community problem.[30]

Commenting on Rebecca Orgain's testimony, Commissioner Holloway stated his understanding that Brew River's CFS were largely "traffic related," and that few involved violence.  He also stated that the Board had a duty to protect the community from shootings.  He asked rhetorically, "If some mother called and said my seventeen year old or my twenty-one year old got shot, and this had been going on for six months, why didn't you [meaning the Board] put a stop to it?"  The other panel members voiced their agreement with this remark.

The Board then adjourned, promising to return a decision within ten days.  Later that evening, the Board found the Orgains guilty of a violation of Md. Code Ann. Art 2B § 10-401(a)(2) and suspended their license for thirty-five days.

---

[29]    Id. at 62.

[30]    In this litigation, Plaintiffs contend that Brew River serves a predominantly white clientele, and that the SPD turned a blind eye to its high number of CFS while clamping down on Andromeda.  At no time during the hearing did the Orgains make this argument.

The Orgains did not take an appeal to the Circuit Court for Wicomico County. Instead, on June 12, 2002, they surrendered their liquor license, and shut Andromeda's doors for good. On July 4, 2002, they notified the City and the Board that they intended to sue. On August 22, 2002, they filed the instant suit.

### B. The Lawsuit

#### 1. The Parties:

The complaint names three plaintiffs: Robert Orgain, Rebecca Orgain, and M31 Andromeda (collectively, "Plaintiffs"). The Defendants are the following:

- The Commissioners of the Board of License Commissioners of Wicomico County: Leo McNeil, W.C. Holloway, and Shirley C. Gray (sued individually and also in their official capacities).

- The City of Salisbury, Maryland ("the City").

- The City's Police Chief, Allan J. Webster (sued individually and in his official capacity).

- Wicomico County.

#### 2. The Complaint's Six Counts:

The complaint asserts three federal and three state claims:

- Count I, filed under 42 U.S.C. § 1983, alleges that Defendants violated Plaintiffs' rights under the Equal Protection Clause by selectively enforcing the laws against them. This count names all Defendants, individually and officially.

- Count II, also filed under 42 U.S.C. § 1983, alleges that the Board denied Plaintiffs' due process rights at the June 4, 2002 hearing. This Count names the Commissioners, both individually and officially.

- Count III, filed under 42 U.S.C. § 1981, alleges that Defendants violated the club's rights to form contracts with its black patrons and black DJs. This Count names all Defendants, individually and officially.

- Counts IV, V, and VI are state law claims. Count IV, which names all Defendants, asserts violations of the Maryland Declaration of Rights, a section of the State Constitution. Count V, which names all Defendants except for the

Board and Wicomico County, alleges tortious interference with contract.  Count VI, which alleges defamation, was voluntarily dismissed by Plaintiffs.[31]

At the summary judgment stage, Plaintiffs voluntarily dismissed all claims against Wicomico County except for the Maryland Declaration of Rights claim (Count IV).[32]

## III.   Applicable Legal Standards

### A.  Standing:

Plaintiffs contend, and Defendants do not dispute, that they have standing to sue to recover for the injuries that they suffered from Defendants' alleged discrimination against their black clientele.  See, e.g., Scott v. Greenville County, 716 F.2d 1409 (4th Cir. 1983); Yesteryears, Inc. v. Waldorf Restaurant, 730 F. Supp. 1355 (D. Md. 1989).  The Orgains may claim damages for emotional distress and for financial losses personal to them.  See, e.g., Carey v. Piphus, 435 U.S. 247, 263-64 (1977); Price v. City of Charlotte, 93 F.3d 1241, 1246 (4th Cir. 1994).  They lack standing, however, to claim damages for losses suffered by the nightclub, which is owned by a LLC, M31 Andromeda.[33]  The latter claims belong to the LLC, which has standing to assert them.[34]

---

[31]    See Plfs. Resp. in Opp. 1.

[32]    Id.

[33]    Shareholders (or in the case of an LLC, its members) do not have standing to sue on the corporation's behalf.  See, e.g., Domino's Pizza v. McDonald, 546 U.S. --, 126 S.Ct. 1246, 1252 (2006); Smith Setzer & Sons, Inc. v. S. Carolina Procurement Rev. Panel, 20 F.3d 1311, 1317 (4th Cir. 1994) (rejecting shareholder's argument that the corporation's loss of revenue resulted in loss of income to him as well).

[34]    A corporation (or an LLC) is a "person" for purposes of the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  See, e.g., Grosjean v. Am. Press. Co., 297 U.S. 233, 244 (1936).  Accordingly, M31 Andromeda has standing to bring an action under 42 U.S.C. § 1983.  See, e.g., Yesteryears, 730 F. Supp. at 1352-54.  M31 Andromeda does not, however, have standing to sue the Board under Counts I - III.  The Orgains held the liquor license, not M31 Andromeda.  See Md. Code Ann. Art. 2B § 9-101(a) (West 2007) ("a license may not be issued to a…limited liability company, but only to individuals authorized to act for

Section 1983, a post civil war statute, allows citizens to sue state actors who have violated rights conferred by the U.S. Constitution or federal statute.[35] <u>Lambert v. Williams</u>, 223 F.3d 257, 259 (4th Cir. 2000) (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3 (1979)).  In order to state a claim under § 1983, Plaintiffs must show that Defendants (i) deprived them of a right secured by the Constitution or other laws of the United States (ii) while acting "under color of State law." <u>Mentavlos v. Anderson</u>, 249 F.3d 301, 310 (4th Cir. 2001) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 150 (1970)).  Those requirements are plainly satisfied here. Plaintiffs allege that Defendants, while acting under Maryland law, deprived them of equal protection under the law and due process. <u>See</u> U.S. Const. amend. XIV.

**B.  <u>Count I: Selective Enforcement</u>:**

In Count I, Plaintiffs seek to vindicate their rights under the Equal Protection Clause. They contend that Defendants "selectively enforced" state and local laws against the club.  A selective enforcement claim consists of two parts: (i) that plaintiff was treated differently than those similarly situated, (ii) for an impermissible consideration such as race. <u>See</u> <u>Snowden v. Hughes</u>, 321 U.S. 1, 8-9 (1944); <u>LeClair v. Saunders</u>, 627 F.2d 606, 609 (2d Cir. 1980); <u>Butler v. Cooper</u>, 554 F.2d 645, 646 (4th Cir. 1977); <u>Eberhart v. Gettys</u>, 215 F. Supp. 2d. 666, 675 (M.D.N.C. 2002); <u>see</u> <u>also</u> <u>Jetstream Aero. Servs., Inc. v. New Hanover County</u>, 1989 WL 100644, *1 (4th Cir.) (unpublished).

---

a…limited liability company").  The Orgains held the liquor license under which the club operated.  Accordingly, the Orgains are the proper plaintiffs with respect to their claims against the Board in Counts I – III.

[35]      In pertinent part, 42 U.S.C. 1983 provides that: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitutions and laws, shall be liable to the party injured."  42 U.S.C. § 1983 (West 2007).

Count I makes two broad factual allegations.  First, that the Board selectively enforced the liquor licensing laws by imposing unreasonably harsh sanctions on the Orgains.  Second, that Chief Webster and the City selectively imposed an oppressive, heavy-handed police presence on Andromeda, driving away customers.  In both cases, Plaintiffs contend that Defendants were animated by racial animus.

The Orgains' allegations against the Board fit neatly within the selective enforcement category.  They allege that the Board fined them and twice suspended their liquor license while acting under color of Maryland's liquor laws.  For its selective enforcement claim against the Board, then, the Orgains must prove: (i) that the Board penalized Andromeda more harshly than similarly situated establishments (ii) because of racial animus.  Gettys, 215 F. Supp. 2d. at 675-77.

With respect to Plaintiffs' "police presence" claim, the analysis is less clear because Andromeda was never prosecuted under the nuisance laws.  Prosecution, however, is not required for a selective enforcement case, because "[t]he use of police force, in a disproportionate manner, to intimidate and harass an establishment and its patrons because of race violates the equal protection clause."  Asher Investments, Inc. v. Cincinnati, 122 Ohio App.3d 126, 135, 701 N.E.2d 400, 405 (1997).

Depending on the issues involved, a § 1983 cause of action can include objective or subjective elements.  For instance, an "excessive use of force" claim under the Fourth Amendment focuses objectively on the degree of force used and not on the subjective intentions of the defendant police officer.  Schulz v. Braga, 455 F.3d 470, 476-77 (4th Cir. 2006).  Conversely, an equal protection claim requires an improper subjective intent on the part of the

defendant.  See Cooper, 554 F.2d at 646 ("plaintiff must allege and prove a deliberate and selective process of enforcement based upon race").

A police presence selective enforcement claim includes both subjective and objective elements.[36]  The plaintiff must show both that the police conduct was objectively unreasonable, and was motivated by an improper consideration such as race.[37]  Before the summary judgment hearing, the Court submitted to counsel a proposed five-part test for assessing the police presence selective enforcement claim.  As framed, the test would require Plaintiffs to show that the police presence was: (i) objectively unreasonable, (ii) disproportionate when compared to other establishments, (iii) calculated to harass and intimidate the club's patrons, (iv) motivated by racial animus, and (v) with the object of driving away its patrons.

Defendants agreed with the test.  Plaintiffs objected to it, though for reasons that are unclear.  They apparently contend that objective unreasonableness should not be a required element.  In other words, an objectively reasonable police presence could be actionable.[38]  The Court disagrees.  Reasonable official conduct does not give rise to a constitutional violation.  The hallmark of an actionable selective enforcement case is the arbitrary, unreasonable use of state authority to persecute a disfavored person.  See, e.g., Esmail v. Macrane, 53 F.3d 176, 179 (7th Cir. 1995).  Accordingly, the Court will apply its five- part test.

---

[36]     See Turner v. Dammon, 848 F.2d 440, 444 (4th Cir. 1988) (analyzing police harassment allegations for objective unreasonableness under Fourth Amendment), abrogated on other grounds, Johnson v. Jones, 515 U.S. 304 (1995); Cottom v. Town of Seven Devils, 2001 U.S. Dist. LEXIS *18; *22 (W.D.N.C. 2001) (analyzing police harassment allegations for objective unreasonableness in a Fourth Amendment and selective enforcement case).

[37]     Id.

[38]     Parties' Joint Resp. to Court's Memo. and Questions of October 30, 2006 at 6.

###### C.     Count II: Procedural Due Process:

In this Count, also advanced under § 1983, the Orgains contend that the Board, acting under color of state law, deprived them of a property interest (their liquor license) without according them due process of law.  The Fourteenth Amendment protects against deprivations of property without due process; it does not substantively create property interests, however. Whether a plaintiff enjoys a protected property interest is determined by "existing rules or understandings that stem from an independent source such as state law." Richardson v. Town of Eastover, 922 F.2d 1152, 1156 (4th Cir. 1991) (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972)).  Accordingly, when evaluating a due process claim, the Court must follow the two-step analysis that the Supreme Court described in Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982) (the court must determine "whether [the plaintiff] was deprived of a protected interest, and what process was his due"). Id.; see Safety-Kleen, Inc. v. Wyche, 274 F.3d 846, 859-60 (4th Cir. 2001).

The Court will assume arguendo that the Orgains did have a protected property interest in their liquor license, and will proceed to the due process analysis.[39]  "Due process, at a minimum, requires that a person be given notice of impending action and afforded a hearing." Town of Eastover, 922 F.2d at 1159 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S.

---

[39]     The Board argues that the Orgains had no protected property interest in their liquor license.  Maryland law describes the licensed sale of alcohol as a privilege that is terminable at will.  See, e.g., Dodds v. Shamer, 339 Md. 540, 546, 663 A.2d 1318, 1321 (1995) ("A liquor licensee possesses no constitutionally protected property right that would restrain the State from exercising its plenary power over the licensee.").  The Board has pointed to no cases holding that the State may revoke or suspend a liquor license arbitrarily, however.  Given the economic value tied up in a liquor license, this Court doubts that the Maryland Court of Appeals would endorse such a proposition.  Because the instant case can be securely decided by addressing the due process afforded to the Orgains, the Court will assume arguendo that the Orgains possessed a property interest in their license.

306, 313 (1950)).  A court must use a sliding scale to determine the required nature of the notice

and the required quality of the hearing.  Id. (citing Goss v. Lopez, 419 U.S. 565, 579 (1975)).  A

more formal hearing is demanded when a significant property interest is impacted.  Id. (citing

Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 168 (1951) (Frankfurter, J.,

concurring); Matthews v. Eldridge, 424 U.S. 319 (1976)).[40]

The general rule is that a hearing need only be provided "at a meaningful time and in a

meaningful manner" in the context of all the attendant circumstances.  Id. at 1160 (citing

Matthews, 424 U.S. at 333).  Matthews uses a three-part balancing test to determine the

adequacy of the hearing.  Id. (citing 424 U.S. at 335).  The Court must weigh:

(i)     the private interest that will be affected by the official action,

(ii)    the risk of an erroneous deprivation of such interest through the procedures used,
        and the probable value, if any, of additional or substitute procedural safeguards,
        and,

(iii)   the Government's interest, including the function involved and the fiscal and
        administrative burdens that the additional or substitute procedural requirements
        would entail.

Id.

**D.  Count III: 42 U.S.C. § 1981:**

Another post civil war era statute, 42 U.S.C § 1981, outlaws racial discrimination in the

making and enforcing of private contracts.  The statute provides that "[a]ll persons…shall have

the same right…to make and enforce contracts…as is enjoyed by white citizens."[41]  42 U.S.C. §

---

[40]     Conversely, when important state interests are involved, especially in exigent
circumstances, pre-deprivation notice and a right to a hearing may be conscribed, so long as
there is adequate post-deprivation relief.  See Jordan by Jordan v. Jackson, 15 F.3d 333, 343 (4th
Cir. 1994) (citing cases).

[41]     The statute defines "make and enforce contracts" to include "the making,
performance, modification, and termination of contracts, and the enjoyment of all benefits,

1981 (West 2007). To prove a § 1981 claim, a plaintiff must show that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest. See, e.g., Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006) (citing cases).

Section 1981 claims are usually analyzed under the same framework as are Title VII claims. See Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989). Absent direct evidence of discrimination, courts use the familiar McDonnell-Douglas burden-shifting scheme. See, e.g., Murrell v. Ocean Mecca Motel, 262 F.3d 253, 257 (4th Cir. 2001). The plaintiff must make a prima facie case of race discrimination. If he does, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for his action. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311 (1996). If the defendant provides such a reason, the plaintiff must prove that the defendant's proffered reason is a mere pretext and that race was the real reason for the action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993).

Here, the parties were unable to find Fourth Circuit case law that lays out the elements of a prima facie case for a § 1981 claim involving police harassment. Borrowing from other contexts, the Court construes the elements that a plaintiff must show as including (i) that he is a member of a racial minority, (ii) that the defendant acted with an intent to discriminate against him on the basis of race, and (iii) that the defendant's race discrimination concerned plaintiffs' "making, performance, modification, and termination of contracts," or the fruits of a contractual relationship. See Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996); see also

privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b) (West 2007).

Cunningham v. Sisk, 2005 U.S. App. LEXIS 9138, *12 (6th Cir. 2005) (unpublished) (applying

Morris three-part test to plaintiffs' allegation of police harassment).

**E.** **Individual and Official Capacity Suits:**

Plaintiffs have sued the Defendants in their individual as well as their official capacities.

When a plaintiff names a defendant individually, he is seeking "to impose personal liability upon

a governmental official for actions he takes under color of state law."[42] Kentucky v. Graham,

473 U.S. 159, 165 (1985).  Naming the defendant in his official capacity is the same as naming

the governmental entity itself.  Hafer v. Melo, 502 U.S. 21, 25 (1991).

A claim against a governmental entity such as a municipality requires the plaintiff to

prove that an official policy, custom, or usage caused the constitutional violation.[43]  See, e.g.,

Monell v. Department of Soc. Services, 436 U.S. 658, 691 (1978); Spell v. McDaniel, 824 F.2d

1380, 1385 (4th Cir.1987).   Accordingly, the Plaintiffs' burden is two-fold: (i) to prove a

constitutional violation (ii) proximately caused by an official policy or custom.  See City of Los

Angeles v. Heller, 475 U.S. 796, 799 (1986); Carter v. Morris, 164 F.3d 215, 218 (4th Cir.

1999).[44]

---

[42]    Officials sued in their individual capacity may raise the affirmative defense of
qualified immunity.  See section III.G., infra.

[43]    Local governments cannot be held liable under a theory of respondeat superior for
the constitutional violations of their employees acting within the scope of their employment.
Monell v. Department of Soc. Services, 436 U.S. 658, 691 (1978); Spell v. McDaniel, 824 F.2d
1380, 1385 (4th Cir. 1987).

[44]    In Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999), the Fourth Circuit
enumerated the places in which official "policy" might be found: (i) in "written ordinances and
regulations," (ii) in "certain affirmative decisions of individual policymaking officials," (iii) and
in "certain omissions on the part of policymaking officials that manifest deliberate indifference
to the rights of citizens."  Id. (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84 (1986)
& City of Canton v. Harris, 489 U.S. 378, 388-89 (1989)).  A municipal custom may arise if a

Here, Plaintiffs allege that two government entities are liable: the Board and the City.

With respect to the Board, Plaintiffs have made no effort to show that the Board adhered to an

official policy of discriminating against establishments with a black clientele.  With respect to

the City, Plaintiffs make three arguments: (i) that Chief Webster, an official city "policy maker,"

selectively enforced the law against the club, (ii) that Webster's actions, together with the pattern

and practice of police harassment, rose to the level of a "custom," and (iii) that the City, through

the Mayor, was "deliberately indifferent" to the Orgains' complaints about the police harassment

of Andromeda.

### F. **Qualified Immunity**:

Chief Webster and the individual Commissioners of the Board have raised qualified

immunity as an affirmative defense.  Public officials performing discretionary functions are

shielded from liability for monetary damages in a § 1983 case unless their actions violate clearly

established federal rights of which a reasonable person would have known.[45]  Braga, 455 F.3d at

476.

The Court first evaluates whether, viewing the facts in the light most favorable to the

plaintiff, the officer has violated a particular constitutional right.  If so, the Court must determine

whether that right was clearly established at the time of the violation.  Id. (citing Saucier v. Katz,

533 U.S. 194, 200 (2001).  With regard to the latter question, the relevant inquiry is whether "it

---

practice is "so persistent and widespread" and "so permanent and well settled as to constitute a
'custom or usage' with the force of law."  Id. (citing Monell, 436 U.S. at 691).

[45]      Qualified immunity protects officials from "bad guesses in gray areas" and
"ensures that they are liable only 'for transgressing bright lines.'"  Marceiariello v. Sumner, 973
F.2d 295, 298 (4th Cir. 1992).  It allows public officials "to act with independence and without
fear of consequences" where their actions do not implicate clearly established rights.  Harlow v.
Fitzgerald, 457 U.S. 800, 819 (1982).  It protects "all but the plainly incompetent or those who
knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

would be clear to an objectively reasonable officer that his conduct violated [the constitutional]

right." Id. (citing Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002).

Qualified immunity is an entitlement not to stand trial or face the other burdens of

litigation. Id. (citing Saucier, 533 at 200-01). Ordinarily, a defendant's entitlement to qualified

immunity is decided at the summary judgment stage.  Id. (citing Willingham v. Crooke, 412

F.3d 553, 558 (4th Cir. 2005)).  "'[T]he purely legal question of whether the constitutional right

at issue was clearly established is always capable of decision at the summary judgment stage,'

but 'a genuine issue of material fact regarding whether the conduct allegedly violative of the right

actually occurred...must be reserved for trial.'"  Id. (quoting Pritchett v. Alford, 973 F.2d 307,

313 (4th Cir. 1992)).

In Count I, M31 Andromeda has met its burden of alleging clear constitutional violations.

Stretching back to Snowden v. Hughes, cases have held that selective enforcement of a local

government's statutes or ordinances based on racial animus violates the Equal Protection Clause.

Gettys, 215 F. Supp. 2d. at 679.  The task before the Court is to examine the record to determine

whether there are triable issues of fact concerning whether the allegedly violative conduct

occurred.

**IV.     Summary Judgment Standard**

The Court may grant summary judgment when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v.

Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have

"an affirmative obligation" to prevent factually unsupported claims and defenses from

proceeding to trial).  Nevertheless, in determining whether there is a genuine issue of material

fact, the Court views the facts, and all reasonable inferences to be drawn from there, in the light

most favorable to the non-moving party.  <u>Pulliam Inv. Co. v. Cameo Properties</u>, 810 F.2d 1282,

1286 (4th Cir. 1987).

## V.     Analysis

### A. <u>Claims Against the Board</u>:

#### 1. <u>Counts I and III: Selective Enforcement and Race-Based Interference with Contract Claims</u>:

Racial animus is an element common to both Counts I and III.  To prove their selective

enforcement claim against the Board (Count I), the Orgains must show (i) that the Board

penalized them more harshly than similarly situated liquor licensees, and (ii) that the Board was

motivated by racial animus.  <u>Gettys</u>, 215 F. Supp. 2d. at 675-77.  To prove their interference with

contract claim (Count III), the Orgains must demonstrate that the Board intentionally

discriminated against Andromeda based on the race of the club's customers.  <u>Denny</u>, 456 F.3d at

434.

Although Plaintiffs were given a full opportunity to develop this issue, their claim of

racial animus is based on speculation rather than solid proof.  At the outset, it is worth noting that

the Board's Chairman, Leo McNeil, is himself black.  Each of the Board's decisions was

unanimous, meaning that McNeil concurred in the result.  Board members McNeil and Holloway

were deposed and both denied that race played any part in their decision making.[46]  At the

summary judgment hearing, Plaintiffs' counsel conceded that she had no direct proof that the

Board was racially biased, meaning that Plaintiffs' case against the Board is entirely

circumstantial.  When asked to marshal the circumstantial proof of bias, counsel adverted to

---

[46]       Apparently, Ms. Gray's deposition was not taken.

three facts: (i) the Board's failure to include written findings of fact in its two orders suspending the Orgains' liquor license, (ii) the severity of the thirty-five day suspension, and (iii) that the race of Andromeda's clientele was mentioned during the June 4, 2002 hearing.

No fair-minded jury could base a finding of bias on these facts. The Orgains correctly note that neither of the Board's orders includes detailed factual findings.[47] This fact does not raise a fair inference of discrimination. No provision of Maryland law requires the Board to make factual findings when issuing a decision. Commissioner Holloway testified on deposition that the Board does not normally provide a factual summary in its orders.[48] Thus, the Orgains were not treated differently.

During discovery, the Board produced its suspension orders dating back to 1977. Andromeda's suspension was the longest, but only to a degree. During the relevant time, the Board handed down six thirty day suspensions.[49] On deposition, Commissioner Holloway explained the Board's thinking behind the length of the suspension. Andromeda, he said, experienced its most severe problems during holidays when the club attracted an overflow crowd that had to be turned away. The Board wanted to ensure that the club would remain closed until the July 4th holiday had passed. Holloway explained that:

> They [the Orgains] stated during the hearings that their biggest problems were during holiday periods, and I asked probably at least three times, what are you all going to do to prevent or to clean up your act? I got no answer. So I recall very well that holidays were – they stated was their worst problem times. Since they

---

[47]     The orders list the charges, those present at the hearing, the decision of the Board, and the notice of a right to appeal the decision.

[48]     Def. Exh. 75 at 59. The Orgains provide a few orders from 2001, and one from 2002, that do contain findings of fact section. This does not rebut Commissioner Holloway's testimony that the Board typically does not issue such findings, however.

[49]     Plfs Resp. in Opp. 73.

had no plan to correct the situation, I thought maybe we needed to make sure they were not open on July 4th. [50]

Holloway also stated that the Orgains needed time to "get a plan in order."

During the June 4, 2002 hearing, James Fountain Smith, an assistant DJ at the club, remarked that Andromeda "deal[s] with ninety percent more black people than other establishments."[51]   Fountain's comment was a footnote to the hearing.  He did not explain himself, the Orgains did not elaborate, and the Board did not pursue his point.  Aside from Fountain's one reference, race was never mentioned during the hearing.  Fountain's comment hardly serves as proof that the Board was animated by race when it decided to suspend Andromeda's liquor license.

The Board has steadfastly denied that race played any role in its decisions.  There is simply no evidence, direct or circumstantial, from which a fair-minded jury could conclude otherwise.  Accordingly, the Court will dismiss Count I as to the individual Board members and as to the Board itself.[52]

## 2.   Count II: Procedural Due Process:

As discussed supra, the Court will assume arguendo that the Orgains had a protected property interest in their liquor license.  Accordingly, the Court will turn to the merits of the Orgains' due process claim, which centers on the June 4, 2002 hearing.  They allege (i) that the notice they received (ten days) was insufficient because they were unable to hire counsel within that time, (ii) that they were not given advance warning that Major Livingston would be

---

[50]   The suspension stretched from June 4 to July 8, 2002.

[51]   Plfs. Exh. 35 at 69.

[52]   Count III, which alleges a violation of 42 U.S.C. § 1981, and which relies on identical facts, will also be dismissed as to these Defendants.

testifying against them, (iii) that they were not afforded an adequate opportunity to cross-examine Livingston, and (iv) that the Board rendered a hasty decision, demonstrating that it had made up its mind before the hearing.

The first claim, dealing with the adequacy of the notice, must be analyzed under the Supreme Court's Mullane standard.  Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Town of Eastover, 922 F.2d at 1160 (quoting Mullane, 339 U.S. at 314).  The second and third claims, which deal with the hearing itself, must be analyzed under the Matthews factors.  The Court must measure the adequacy of the hearing provided in terms of the gravity of the property interest, the risk of an erroneous result, and the gravity of the public interest.  Id. (citing Matthews, 424 U.S. at 333).  With respect to the fourth claim (bias), the Board's decision is entitled to "a presumption of honesty and integrity," that can be overcome only by a "demonstration of 'extrajudicial' bias."  Id. at 1161 (quoting Boston v. Webb, 783 F.2d 1163, 1166 (4th Cir. 1986)).

When measured by these tests, the Orgains' due process challenges fall short.  Taking the issues in turn, the Court finds that the notice to the Orgains was adequate.  They received the show cause order the statutorily-required ten days in advance of the hearing date.  See Md. Code Ann. Art. 2B §10-403(a) (West 2007).  The notice referenced the statute under which they were charged.[53]  The Orgains were well aware that the hearing would center on the continued violence at the club.  The Orgains knew that they were entitled to appear with counsel.  They had participated in an earlier hearing and knew what format to expect.  Had they exercised diligence,

_____

[53]     Maryland Article 2B §10-401(a)(2) allows for the suspension or revocation of a liquor license for "any cause which in the judgment of the officials, court or board is necessary to promote the peace or safety of the community in which the business is located."

ten days was ample time for the Orgains to retain a competent attorney to represent them.  Due

process did not require the Board to grant the Orgains' last-minute request for a two week

postponement so that they could be represented by a specific attorney.  Accordingly, the notice

to the Orgains cannot be faulted on due process grounds.

The Board hearing itself afforded the Orgains many of the procedural safeguards of a

court trial.  As mentioned, the Orgains had the right to appear through counsel.  The hearing was

open to the public.  The proceedings were recorded and a transcript was subsequently prepared.

The Orgains were present at all times.  They had a full opportunity to comment on Livingston's

testimony, to testify themselves, to offer documentary evidence, and to call witnesses.  The

Orgains took advantage of these opportunities.   An examination of the seventy-five page

transcript discloses that half of the hearing was devoted to the Orgains' defense.  The Orgains

also had the right to appeal the suspension to the Circuit Court for Wicomico County.

The Orgains' criticisms of the hearing focus on two points.[54]  First, that they did not

know that Livingston would be testifying.  Second, that they did not have the opportunity to

cross-examine Livingston.  These criticisms cannot withstand scrutiny.  The subject matter of the

hearing came as no surprise.  The Orgains were fully aware that the Board had scheduled the

hearing in response to the continuing violence at the club.  They were conversant with the CFS,

because club personnel had placed the bulk of the Calls.  In advance of the hearing, the Orgains

had obtained the SPD records concerning most of the Calls through a Public Information Act

request.[55]  The Orgains, therefore, cannot argue that they were caught unprepared.

---

[54]     Plaintiffs also argue that the Orgains were denied "meaningful post deprivation
remedies."  They never identify the "remedies" that were interfered with, however.  The Orgains
never appealed the decision to the Circuit Court of Wicomico County, and do not claim that they
were somehow prevented from appealing.  Accordingly, the argument fails.

[55]     Md. Code Ann., State Gov't, § 10-602, et. seq.

26

The Orgains also complain that they were not given the opportunity to cross-examine Livingston. The assertion is apparently incorrect. At the first hearing, the Orgains' counsel cross-examined the witnesses. At the second hearing, the Orgains did not request an opportunity to cross-examine Livingston, and they not shown that the Board would have denied such a request. In any event, cross-examination would have been of limited utility. Livingston was not a fact witness with first-hand knowledge of the events behind the Calls. He was essentially Although Livingston expressed the Department's position respecting the club, he was essentially a summary witness who read the violence-related CFS into the record.

Although the Orgains did not cross-examine, they had a full opportunity to provide their own views concerning the CFS. They addressed specific Calls, stating that some were not as serious as they appeared. They expressed their view that hooligans, rather than Andromeda patrons, were responsible for the violence. They argued that the club's record was improving and no worse than Brew River's. They reminded the Board of their efforts to improve security, a subject that had been thoroughly covered at the first hearing. They also called two witnesses to testify on the club's behalf.

The Orgains, therefore, presented a comprehensive, albeit unsuccessful, defense. In their summary judgment papers, they never identify any new line of defense that they would have offered had they been given an extra two weeks to prepare or had they known that Livingston would testify.

With these facts in mind, the Court turns to the <u>Matthews</u> factors. Assessing the first factor (the gravity of the private interest), the Court concludes that the value of the Orgains' license was minor because, under Maryland law, licensed establishments are highly regulated

and a liquor license "may be revoked or suspended for *any* cause which in the *judgment of the…board*[] is necessary to promote the peace or safety of the community."[56]

As to the second factor (the risk of an erroneous deprivation of a property right), the Court concludes that the risk, under the procedures in place, was small.  As mentioned, the Orgains never point to persuasive evidence that they would have offered had the Board accorded them a postponement or a more formal hearing.  The Board took seventy five pages of testimony and reached a result that is fully supported by the record and that the Board had the statutory discretion to make.  The Orgains may disagree with that decision, but they have failed to show that it was arbitrary or erroneous under law.

The third <u>Matthews</u> factor (the public interest) also weighs in the Board's favor.  The Orgains' principal grievance is that the Board declined to grant them a two-week continuance.[57]  As a quasi-judicial tribunal, the Board has a strong interest in controlling its own docket, particularly in exigent cases.  At the hearing, the Board, which has a statutory duty to protect the public, expressed concern about the serious violence at Andromeda and the need to address the situation promptly.[58]  The Board was entitled to insist on a prompt hearing.

---

[56]    Md. Code Ann. Art. 2B § 10-401(a)(2) (emphasis added).  A license that may be suspended or revoked on a broad range of contingencies is less valuable than one subject to a more stringent showing.  See <u>Richardson v.Town of Eastover</u>, 922 F.2d 1152, 1159-60 (4th Cir. 1991).

[57]    The third factor includes the cost to the governmental body of affording the procedural safeguards advocated by the plaintiff.  <u>See id.</u> at 1161.  This issue comes into play when the cost to the public must be weighed against a procedure (such as affording a hearing) of acknowledged value.  <u>See id.</u>  The issue is irrelevant here because the Orgains have pointed to no significant procedure that was denied them.

[58]    The Board has a statutory duty to protect the safety of the community.  <u>See</u> Md. Code Ann. Art. 2B § 10-401(a)(2).

Finally, the Orgains contend that the Board was biased against them. They argue that the speed with which the Board made its decision indicates that the Board had "made up its mind before the hearing even started."[59] The claim is without merit. Courts routinely rule from the bench at the conclusion of hearings. The Orgains have presented no evidence of "extrajudicial bias" that could overcome the presumption of "honesty and integrity" that attends the Board's actions. Town of Eastover, 922 F.2d at 1161.

For the above reasons, the Orgains' procedural due process claim fails, and Count II will be dismissed.[60]

### B.  Claims Against the City of Salisbury and Chief Webster:

#### 1.  Count I: Selective Enforcement Liability:

The Orgains contend that Chief Webster and the City of Salisbury used their law enforcement powers to harass Andromeda because of the race of its patrons. In this context, "[t]he use of police force, in a disproportionate manner, to intimidate and harass an establishment and its patrons because of race violates the equal protection clause." Asher, 122 Ohio App.3d at 135; 701 N.E.2d at 405.

The Plaintiffs allege that the SPD harassed the club and its customers through the following actions:

- Spreading rumors about the club.
- Singling out black club patrons for "unlawful traffic stops."
- Singling out black patrons for "interrogations."
- Spraying mace on crowds at Andromeda without justification.

---

[59]      Plfs. Resp. in Opp. 71.

[60]      In its summary judgment brief, the Board claims that it is a body entitled to sovereign immunity. Because the Court concludes that due process was afforded to the Orgains, there is no need to reach the immunity issue.

- Acting less "responsively" and "cooperatively" when responding to Andromeda CFS.
- Exhibiting a "hostile attitude" towards Andromeda.
- Subjecting the club to an "invasive, unjustified, and pervasive police presence."

The allegations were extensively explored during discovery. As is discussed <u>infra</u>, the Orgains offer little evidence to support their charges.

### i. "Spreading rumors about the club":

Plaintiffs allege that unidentified officers of the SPD "spread rumors" that Andromeda was "under investigation," "would be raided or shut down," and/or was "a black club" that "was full of drug activity." Compl. ¶ 17. On summary judgment, however, Plaintiffs offer no evidence that any member of the Department spread such rumors.

### ii. "Unlawful Traffic Stops":

In their complaint, Plaintiffs allege that the SPD singled out Andromeda's customers "for unlawful traffic stops." Compl. ¶¶ 55, 59. On summary judgment, Plaintiffs offer three pieces of evidence to back this allegation.

Plaintiffs first point to the deposition testimony of Tyrae W. D. Cuffae, a member of Andromeda's security staff from Spring 2001 to late 2001.[61] Cuffae testified that one night in January 2002 he was stopped by a Salisbury police cruiser as he drove through the club's parking lot.[62] Cuffae volunteered that "it wasn't really being pulled over," and that he was neither cited nor warned.[63] He stated that the officers informed him that he was trespassing because the club was closed. According to Cuffae, the officers were polite.[64]

---

[61]   Plfs. Exh. 21 at 20.

[62]   The incident occurred in January 2002, likely on an evening that Andromeda was serving the five-day suspension for serving alcohol to underage women. <u>See</u> <u>id.</u> at 18.

[63]   <u>Id.</u> at 14.

Plaintiffs cite to the depositions of Harry T. Tindall, III, the head of Andromeda security from late 2001 to June 2002, and Shemika Wilson, a regular club patron during the summer of 2001.  Tindall testified that Salisbury police officers would park across the street from the club and that as patrons left, "they would pull them over."[65]  Wilson stated that Salisbury police would "try to catch people…drinking and driving going down the street."[66]

This conclusory testimony is not probative.  It fails to establish how frequently the SPD stopped Andromeda patrons, whether the police targeted black drivers, whether the police acted rudely, whether the stops were disproportionate when measured against other establishments or other parts of the city, whether the traffic stops dissuaded people from coming to the club.  There is, therefore, no competent evidence to support the allegation that the police singled out Andromeda's black customers for traffic stops.

### iii.  "Interrogations":

Plaintiffs allege that Salisbury police "singled out Andromeda's…primarily African American customers[]…for interrogations."  Compl. ¶ 55.  Plaintiffs rely on a single incident to support this contention.  Rebecca Orgain states that one evening she comforted a "young lady" (black) who entered the club "crying, and complaining about the police in the parking lot."  According to Ms. Orgain, the woman complained that she had been "ID'd," "asked pointed questions," and frightened when police insinuated that they might raid the club.

---

[64]    Id. at 15.

[65]    Def. Exh. 54, at 52.

[66]    Plfs. Exh 18 at 19.

Ms. Orgain's testimony proves nothing.  It is a single event.  Moreover, while Ms. Orgain is competent to state that the young woman appeared upset, the remainder of her testimony is inadmissible hearsay.  Accordingly, the Orgains offer no proof to support their contention that the SPD interrogated the club's clientele.

### iv. __Improper Use of Pepper Spray / Mace:__

Keith Orgain, who served in several capacities at Andromeda, testified that the SPD employed a "mace first, ask questions later" policy in dealing with crowds on hip hop nights.[67] The Orgains point to two occasions during the club's twenty month history when the SPD used mace or pepper spray near the club.  The evidence concerning these incidents is as follows:

On May 10, 2001, Andromeda security called the SPD at 2:30 a.m. to report a large crowd that had gathered on the club's parking lot and that refused to leave.[68]  The police responded.  Club security explained that a fight had broken out, but that the people involved in the fight had already left.  They asked the officers to disperse the crowd.

The officers were complying with the request when several beer bottles were thrown at them.  According to Robert Orgain, who was present, the police used  mace or pepper spray to help disperse the crowd.[69]  Orgain does not state whether anyone received a dose of the spray. No injuries were reported.

---

[67]     Plfs. Resp. in Opp. 15.

[68]     Def. Exh. 7 (police report from May 10, 2001).

[69]     Plfs. Exh. 14 at 38-39.

According to Keith Orgain, Salisbury police used pepper spray a second time sometime over the July 4, 2001 weekend.[70]  He testified on deposition that Andromeda security had to turn many people away because the club had reached its capacity.  A large, unhappy crowd then assembled in front of the club and was "unwilling to disperse."[71]  Although the record is silent on this point, Andromeda apparently called the police, requesting them to handle the situation.  In any event, Keith Orgain testified that the police "spray[ed] pepper spray, crowd control, out into the crowd."[72]  He does not say how many officers used mace, or whether anyone in the crowd received a dose of mace.  Again, there were no reported injuries.

Thus, Plaintiffs' allegations of excessive mace boil down to two occasions when the police used pepper spray to disperse a large, threatening crowd that Andromeda security was unable to control.  There is no evidence that anyone received a dose of mace, that mace was used contrary to police protocol, or that the police used the spray other than to cause people to retreat from it and go home.

### v. "Acted Less Responsively":

Plaintiffs allege that the SPD failed to respond promptly when called to Andromeda.  See Compl. ¶¶ 21, 56.  As Robert Orgain admitted during his deposition, the Plaintiffs made no effort to show a systematic pattern of slow response times or failures to assist.[73]  Rather, Plaintiffs

---

[70]      Def. Exh. 51 at 37.  Shemika Wilson, a club patron during the Summer of 2001, did testify that the Salisbury police sprayed mace on three occasions "to move people" when the club was letting out.  Def. Exh. 18 at 17-18.  She did not describe any of the occasions, however. Id.  Neither police reports nor the Orgains describe incidents other than those recounted above.

[71]      Def. Exh. 51 at 36.

[72]      Id. at 37.

[73]      Plfs. Exh. 14 at 49.

support this claim by pointing to three instances when the police allegedly were slow to respond or "failed to intervene when help was needed."[74]  They are as follows:

First, in his deposition, Robert Orgain testified that on July 4th, 2001, as many as "2,000 people showed up" at the club, and that those who were turned away at the door became "unruly."[75]  Orgain complained that the SPD left the club before the crowd had fully dispersed.  Unrebutted police reports from July 4th, 2001 (actually, the early morning of July 5th) show that the SPD responded to Andromeda twice that night.[76]  SPD first responded to a report of a "disorderly crowd."  An hour later, SPD responded to a Call for a "large fight."  The SPD officers waited for reinforcements from the Wicomico County Sheriff's Office, then spent approximately forty minutes clearing the lot of after-hours loiterers.

Second, Harry Tindall complained that on the night of the shooting (May 12th, 2002), the police dispatcher unduly delayed sending assistance, insisting on being told more information about the shooter and the "nature of the call."[77]  Defendants provided the unrebutted affidavit of Peggy Disney, the SPD dispatcher who was on duty that morning.[78]  She states that she asked Tindall "routine" questions while "simultaneously" dispatching officers to the scene.[79]  The unrebutted dispatch report shows that the police arrived promptly.[80]

---

[74]    Plfs. Resp. in Opp. 16.

[75]    See Plfs. Exh. 14 at 43-44.

[76]    Def. Exh. 8.

[77]    Plfs. Exh. 19 at 35.

[78]    Def. Exh. 76 ¶¶ 4, 6, 7-8.

[79]    Id.

[80]    Def. Exh. 56.

Third, Keith Orgain stated that officers were present at the club when shots were fired in the parking lot.[81] He faults the officers for "d[oing] nothing" about the situation. Orgain expected the police to set up a road block at the parking lot exit and either search the cars or question the occupants as they left the lot. The contemporaneous police report discloses that the officers, who were there at the club's request, saw muzzle flashes and ran towards the area where the shows had been fired.[82] No one could describe the shooters. The officers collected the shell casings, but were unable to develop any suspects.

These three incidents prove nothing. They are an isolated handful culled from the dozens of CFS concerning Andromeda. Plaintiffs never compare police response times to Andromeda against response times to other establishments. The police records demonstrate that the SPD responded to all three incidents. Accordingly, there is no evidence that the SPD handled Calls from Andromeda in a disparate manner.

### vi. "Exhibiting a More Hostile Attitude":

Plaintiffs allege that the SPD exhibited a more hostile attitude towards Andromeda patrons than towards patrons of other clubs. On summary judgment, Plaintiffs rely on two pieces of evidence. First, Adrienne Sperling, a regular patron of the club, testified that the "police aura" at Andromeda was not as friendly as that at Brew River.[83] When asked what she meant, Sperling explained that the police were frequently "lurking," "lingering," and waiting around the club.[84]

---

[81]   See Plfs. Exh. 3 at 68-69. The incident likely occurred on May 19, 2002.

[82]   Def. Exh. 37.

[83]   Plfs.' Resp. in Opp. 16 (quoting Exh. 7 at 36-37).

[84]   Plfs. Exh. 7 at 37.

When defense counsel asked Sperling whether the police presence dissuaded her from attending the club, she answered that it had not.[85]

Second, James Fountain Smith testified that when "a fight or shooting would happen, they [the police] were more worried about rushing people out the parking lot or going around, to me, harassing patrons than doing their job[s]."[86]  When asked what he meant, Smith seemed to fault the police for being impolite when directing Andromeda customers to leave the parking lot.[87]  Smith made no comparison between the demeanor of the police officers at Andromeda and any other club.

### vii.  "Invasive, Unjustified, and Pervasive Police Presence":

Plaintiffs contend that the SPD maintained an oppressive presence around Andromeda, especially on Wednesday and Saturday hip hop nights.[88]  Before the summary judgment hearing, the Court requested Plaintiffs to describe the police actions in detail.  Plaintiffs responded with a narrative and a detailed affidavit from Robert Orgain.[89]

Orgain stated that on hip hop nights, one to two Salisbury patrol cars (with one or two officers per car) would regularly park across the street from the club.  He described the cars as being "intermittently present" for "limited periods throughout the evening."[90]  "Periodically," he added, "the police would be present near the property (one or two blocks away) where they could

---

[85]    Id. at 38-39.

[86]    Plfs. Exh. 16 at 19.

[87]    Id.

[88]    See Plfs. Resp. in Opp. 15-16, 23.

[89]    See Decl. of Robert Orgain ¶ 6 (Docket No. 128).

[90]    Id.

observe patrons leaving."[91]   According to Orgain, the "police presence exuded the appearance of setting a trap." [92]

Orgain also stated that the police patrolled the Andromeda parking lot.  He observed at least one squad car and one officer on the lot "virtually every Wednesday night."[93]  On most hip hop nights, "multiple" patrol cars would enter the parking lot on "multiple occasions, perhaps as much as once every half hour."[94]

At the summary judgment hearing, the Court established that the police did not patrol inside Andromeda, and that they did not activate their emergency lights while parked or patrolling.  Plaintiffs do not allege that the police set up roadblocks or checkpoints.  Their core allegation, therefore, is of a "looming" police presence on hip hop nights.  They contend that the police presence was excessive, that the police were more in evidence at Andromeda than they were at other Salisbury clubs, and that the police presence deterred customers from patronizing the club.[95]

### viii.  **Analysis of the Selective Enforcement Claims:**

The Court will now analyze the selective enforcement evidence.  As described <u>supra</u>, Plaintiffs' allegations fall into two broad categories: specific instances of misconduct and excessive police presence.  As to the first category (specific misconduct) there is insufficient

---

[91]     <u>Id.</u>

[92]     <u>Id.</u>

[93]     <u>Id.</u> ¶ 7.

[94]     <u>Id.</u>

[95]     <u>See</u>, <u>e.g.</u>, Compl. at ¶¶ 55, 62; Parties' Joint Response to Court's Letter Order of October 30, 2006 at 65.

evidence from which a fair-minded jury could sustain them or construe them as a constitutional

violation.  These claims, therefore, fail.

With respect to the second category (looming police presence), the claim fails, but for a

different reason.  No reasonable jury could find that it was unreasonable for the Department,

given Andromeda's troubled history, to increase its presence near the club as a deterrent to

trouble.  To survive summary judgment on the issue of "police presence," Plaintiffs were

required to raise a genuine issue of fact that the police presence: (i) was unreasonable, (ii)

disproportionate when compared to other establishments, (iii) calculated to harass and intimate

the club's patrons, (iv) motivated by racial animus, and (v) with the object of driving away its

patrons.  This they failed to accomplish.

As to the first factor (reasonableness), the police presence at Andromeda was not

unreasonable given the level of violence at the club.  A history of violence justifies a heightened

police presence.  See Turner, 848 F.2d at 447 (a history of violations justifies increased police

attention); Cottom, 2001 U.S. Dist. LEXIS 7888 at *18 (citing Turner for same proposition); see

also Harry's Cocktail Lounge, Inc. v. McMahon, 1995 WL 33885, * 18 (C.D. Cal 1995)

(unpublished) (history of criminal acts, suspected drug activity, and high number of CFS

justified increased police scrutiny).

In this respect, the instant case differs markedly from those in which bar owners have

withstood a motion for summary judgment.  For example, the plaintiffs in Turner were owners of

a topless bar in St. Mary's County, Maryland.  848 F.2d at 441.  They contended that the police

performed an excessive number of "bar checks" in order to harass the bar.[96]  The police

---

[96]     A bar check is a warrantless search of any premise on which alcoholic beverages
are authorized to be sold.  See Md. Code Ann., Art. 2B § 16-405 (West 2007).  Law enforcement
officers are authorized to conduct bar checks to detect violations of state law.  Id.

conducted over one hundred such checks over a two-year period.  Id. at 442.  The checks, which were more frequent than at other establishments, interfered with the club's business.  Id.  The Fourth Circuit Court of Appeals affirmed the district court's denial of summary judgment to the police officers who took part in the checks, remanding the case for a trial to determine whether the pattern of harassment violated the Fourth Amendment.  Id. at 445.

Another pertinent case is Asher.  See 701 N.E.2d at 402.  The plaintiff owned a bar that attracted a predominantly black crowd.  The owner alleged, inter alia, that at closing time the police department dispatched upwards of thirty officers, including mounted troopers and riot police, to the club.  Id.  The police cordoned off the adjacent streets and "herded" customers away from the nightclub at closing time.  Id.  The Ohio Court of Appeals reversed the trial court's grant of summary judgment for defendants, remanding the case for a trial on plaintiff's selective enforcement claim.  Id, at 405; see also Gettys, 215 F. Supp. 2d at 678 (denying summary judgment where plaintiffs produced evidence that, inter alia, city had selectively prosecuted club for a number of noise violations because of the race of the club's owners).

In maintaining order, the police must be accorded considerable latitude.  They cannot be second-guessed unless their methods are demonstrably unreasonable or oppressive.  The facts presented here are in line with those in which courts have granted defense motions for summary judgment.  In Cottom, for example, plaintiffs, owners of a resort, alleged that the police harassed their guests during two parties that the resort hosted.  According to the plaintiffs, the police questioned several guests, issued citations to several others, and conducted "excessive patrols" inside the club.  Cottom, 2001 U.S. Dist LEXIS 7888 at *6.  The Court found that the police action did not constitute harassment and failed to rise to the level of a constitutional violation.  Id. at *18; 22.

In <u>Melkonian v. City of Havelock</u>, 1991 WL 57240 (4th Cir. 1991) (unpublished), the Fourth Circuit, albeit in an unpublished opinion, held that the plaintiff bar owner had failed to generate an issue of fact that his bar had been subjected to a "systematic scheme of harassment and intimidation." <u>Id.</u> at *3. The Court found that the plaintiff had "only" alleged that police officers posted themselves near the club and stopped some customers "as they left 'as if they were driving while impaired.'" <u>Id.</u>

As to the second factor (disproportionality), the Plaintiffs' showing that the police presence at Andromeda was disproportionate can only be characterized as weak. Plaintiffs point out that Brew River, a country-and-western themed restaurant and bar, generated a greater number of CFS during the twenty month period when Andromeda was in business. The Orgains offered some deposition and affidavit testimony that the SPD was more in evidence at Andromeda than at Brew River.

There are, however, significant differences between the two establishments. Andromeda, a much larger club, was located in a section of Salisbury zoned light industrial. The neighboring businesses were closed at night. Andromeda, therefore, generated few CFS from neighbors complaining of nuisances. A large percentage of Andromeda's CFS, approximately 40%, concerned reports of violence.[97] Brew River, by contrast, is located in downtown Salisbury, and its neighbors included other establishments that are open at night. Many of Brew River's CFS were traffic-related, a smaller percentage were related to violence, and there were no incidents involving guns or shootings.[98] The police were not called upon, as they were at Andromeda, to disperse large, unruly crowds after closing time.

---

[97]     <u>See</u> Plfs. Exh. 48.

[98]     <u>See</u> Plfs. Exh. 49.

The Plaintiffs also fail to provide a detailed picture of the police presence at Brew River or any other similarly situated establishment.  Their evidence consists of conclusory, anecdotal opinions that the police were more in evidence at Andromeda than they were at Brew River or other Salisbury establishments.

As to the third factor (calculated to harass), it is difficult to understand why Plaintiffs would find it undesirable to have the police in evidence near the club.  The Orgains testified before the Board that they welcomed a robust police presence.  They requested the SPD to come to the club at closing time to encourage people to leave.[99]  They hired off-duty Prince George's County police officers as security guards to maintain better order.[100]  They feared that the outbreaks of violence were costing them patronage.[101]  Plaintiffs also fail to explain satisfactorily why a police presence would deter the law-abiding clientele that they wished to attract.  Indeed, Ms. Orgain testified that patrons valued Andromeda's efforts to beef up its security.[102]

The Court next turns to Plaintiffs' evidence that the police presence was motivated by racial animus (the fourth factor).  Plaintiffs offer three anecdotes.  First, on September 30, 2001, Officer Morto of the SPD privately remarked to Robert Orgain "what a black mob" when referring to a crowd of patrons waiting to enter the club.[103]  Second, Harry Tindall stated that two police officers, who were friends of his, privately teased him for working at a "n---- club."[104]

---

[99]     Plfs. Exh. 35 at 50.

[100]     Id. at 36-40.

[101]     Id. at 48.

[102]     Id. at 39.

[103]     Plfs. Exh. 14 at 64.

[104]     Plfs. Exh. 19 at 60.

Third, on January 14, 2002, Plaintiffs claim that Detective Barry Tucker "told [Freedom] Ford, a club employee, that Andromeda should change its format from hip hop to country and western to bring a better crowd."[105]

The comments made by Officer Morto and the unidentified police officers are offensive, but they are also stray and isolated.  Random racial remarks by three officers do not signify that a force of approximately 75 to 78 officers is infected with racial animus.  Cf. Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993) (conduct merely offensive is not actionable under Title VII); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981) (no violation of Title VII from infrequent use of racial slurs).  Furthermore, these remarks are utterly unconnected to any of the alleged incidents of harassment.  Cf. Boyd v. State Farm Ins. Co., 158 F.3d 326, 330 (5th Cir 1998) (holding that absent a casual link between supervisor's isolated racial remarks and employer's decision to promote, stray remarks cannot support a verdict for race discrimination).  Indeed, other than being quoted, neither Officer Morto nor the officers identified by Harry Tindall played any role in this litigation.

Detective Tucker's conversation with Freedom Ford must be examined in context.  Tucker was interviewing Ford as part of an investigation into a shots-fired incident.  Tucker reviewed with Ford the steps that the club had taken to improve security.  Among other measures, Ford stated that the club had purchased metal detectors and had switched from serving bottles to plastic cups.

Tucker did ask Ford whether the club had ever considered changing the Wednesday theme from hip hop to something else, such as "country."  According to Ford, Tucker remarked

---

[105]     Plfs. Resp. in Opp. 18-19.

that Salisbury did not want a hip hop club because "it brings trouble."[106]  Ford agreed with

Tucker that Andromeda had experienced problems on hip hop nights.  He also stated that Club

Vissage, another club offering hip hop entertainment, had experienced similar problems with

violence.  Ford stated his view that shutting down the hip hop clubs would simply move the

problem somewhere else.[107]  The better solution, he explained to Tucker, was to weed out the

trouble-makers rather than close down the clubs.  According to Ford, Tucker expressed

agreement and did not pursue the matter: "It was kind of like, all right…that's all we need to

hear."[108]  Ford was asked whether there was anything "overtly racist or racial" about Tucker's

comments.  He responded in the negative.[109]

In the Court's view, Tucker's remarks cannot be fairly construed as indicating racial bias

on his part.  He did not mention race, and he simply pointed out a fact that Ford readily agreed

with, that hip hop nights were plagued by violence.  He cannot be labeled a racist for making the

practical suggestion that Andromeda pick some other theme.  He did not dismiss Ford's assertion

that the solution lay in weeding out the people who caused the problems.

As to the fifth factor (drive away patrons), Plaintiffs produce no evidence tending to

prove that the police presence did, in fact, deter customers from patronizing the club.  They offer

no affidavits, deposition testimony, or survey evidence on this point.  They fail to counter

---

[106]      Plfs. Exh. 24 at 48.  During his deposition, Ford was asked whether hip hop music
was restricted to black patrons.  He responded, "No, its not.  It's a – hip hop is basically – it's a
cultural type music" that was growing in popularity and drew a younger, dance-oriented crowd.
Id. at 50.  He did, however, take Tucker's comment about hip hop clubs as indicating that
Salisbury "did not want the black music."  Id. at 69.

[107]      Id. at 49.

[108]      Id.

[109]      Id. at 51.

deposition testimony that supports the opposite conclusion.  For example, former patron Adrienne Sperling stated that while she found the "police aura" at Andromeda to be unpleasant, it did not deter her from frequenting the club.[110]  Former employee Tyrae Cuffae testified that the police presence did not bother him.[111]  Other club staff members stated that the police presence in the parking lot was desirable.[112]

Moreover, Andromeda's financial records, which Plaintiffs never attempt to analyze, do not support the claim that the police drove away club patrons.[113]  Plaintiffs testified that the oppressive police presence occurred on Wednesday and Saturday hip hop nights, but those nights were the club's most successful entertainment offerings.

For the above reasons, therefore, Plaintiffs cannot satisfy the five-part test.  Accordingly, their claim fails.

## 2.  **Count I: Selective Enforcement Liability and Chief Webster:**

Having assessed the Plaintiffs' allegations against the SPD, the Court next turns to their selective enforcement case against Chief Webster.  Count I comprises two elements: (i) that Chief Webster selectively treated the Orgains compared to similarly situated owners of nightclubs, and (ii) that he was motivated by racial animus.  Gettys, 215 F. Supp. 2d at 675-77. Plaintiffs name Chief Webster in his individual and official capacities.  The suit against Webster is equivalent to a suit against the City.  The Plaintiffs contend that the City is liable because the Chief is an official "policy maker" under Monell.

---

[110]   Plfs. Exh. 7 at 38-39.

[111]   Plfs. Exh. 21 at 13.

[112]   See, e.g., Def. Exh. 55 at 31-11; Exh. 58 at 30-34.

[113]   Plfs. Exh. 55.

Other than arguing that Webster, as Chief, was in charge of the SPD, the Orgains offer no proof that he was responsible for the allegedly oppressive police presence. Instead, their claim focuses on what they characterize as his effort to intimidate the club. What follows are Plaintiffs' allegations of selective enforcement against Webster:

- That Chief Webster wrote the Orgains letters in which he threatened to prosecute them for maintaining a common nuisance, and that Webster intimidated them by having the second letter hand-delivered by a uniformed officer.

- That Webster did not invite the Orgains to consult with the Department's Community Affairs Officer, refused to meet with Robert Orgain, and "pestered" the State's Attorney to prosecute the Orgains for nuisance.

The Court first turns to the evidence that Plaintiffs offer in support of these allegations, and then addresses Plaintiffs' evidence that Webster was motivated by racial animus.

### i.   **The Letters**:

On August 9, 2001, the SPD took a report concerning a fight and a gunshot in Andromeda's parking lot. On August 10th, Chief Webster wrote the Orgains, warning that he would "explore violations of the nuisance law" if better order was not maintained.[114] Five months later, on January 2, 2002, shots were reported fired on Andromeda's parking lot. A week later, on January 10th, shots were reported fired inside Andromeda itself. On January 11th, Chief Webster wrote a second warning letter to the Orgains. He observed that since his first letter Andromeda had been the subject of twenty-six new CFS, eleven of which were violence-related. He stated that he would seek "criminal sanctions" based on this "history of violence."[115] At Webster's request, this letter was hand-delivered by a uniformed police officer. The Orgains cite these letters as examples of selective enforcement, claiming that other nightclubs with bad CFS

---

[114]   Webster carbon-copied the Mayor, the Board, and the Wicomico County State's Attorney.

[115]   Def. Exh. 28.

histories did not receive such letters, and that having a uniformed officer deliver the letter was an intimidation tactic.

These contentions were explored during discovery.  Defendants demonstrated that the warning letters are not unique, producing two similar letters that Webster had sent Salisbury property owners warning that nuisance charges would be sought if they did not reduce their CFS.[116]  Hand-delivering a warning letter was also not unprecedented.  On deposition, Lieutenant Elmer Davis, the Community Affairs Officer, testified that he had personally hand-delivered such letters.[117]  Additionally, Chief Webster has a neutral reason for having the second warning letter delivered in person.  The Orgains had complained to the Board that they had never received Webster's first warning letter of August 10th.[118]  Hand delivering the second letter would verify that it reached the Orgains.

**ii. <u>Webster's Failure to Invite the Orgains to Meet with the Department's Community Affairs Officer, Refusal to Meet with Robert Orgain, and "Pestering" the State's Attorney's Office</u>:**

Plaintiffs contend that Webster, on February 7, 2002, "sent a letter to *every* club in the City, *except* Andromeda, setting out the number of calls for service for the previous year and inviting the owners to seek assistance from Community Affairs representative Elmer Davis 'to assist with efforts to reduce the calls.'"[119]  Plaintiffs also claim that selective enforcement is behind (i) Webster's refusal to meet with Robert Orgain concerning the January 11, 2002

---

[116]     <u>See</u> Def. Exh. 12.

[117]     Plfs. Exh. 26 at 56.

[118]     Def. Exh. 14 (letter to the Board from the Orgains).

[119]     Plfs. Resp. in Opp. 23 (emphasis in original).

warning letter, and (ii) Webster's "pestering" of the State's Attorney of Wicomico County to file nuisance charges against the club.

These contentions were addressed during discovery. The record shows that Webster sent the February 7th letter to approximately six Salisbury establishments, not all of them. The six that received letters had, in Webster's view, posted unacceptably high numbers of violence-related CFS during a twelve month period.[120] Webster did not include Andromeda and he declined to meet with Robert Orgain because he had already determined that prosecution was appropriate.[121]

With respect to the allegation of pestering, the record discloses that Webster's sole follow-up consists of a single email that he sent State's Attorney Davis Ruark on February 7, 2002. The email reads as follows: "I was wondering if your office has made a decision on moving forward on the information that was forwarded on the Andromeda nightclub."[122]

### iii. **Webster's Alleged Racial Bias:**

As discussed supra, the evidence against Chief Webster are not substantial enough to carry the heavy freight of a suit for selective enforcement. The same is true concerning the Plaintiffs' proof of bias. At the summary judgment hearing, Plaintiffs' counsel conceded that there was no direct evidence that Chief Webster is biased against blacks. Their proof of discriminatory animus is circumstantial and centers on the following contentions:

- That Webster did not intercede in an altercation between a black City Councilwoman and the Mayor's white daughter.

---

[120]    Def. Exh. 35

[121]    On January 11, 2002, Webster referred Andromeda to the State's Attorney's Office for prosecution. Exh. 65 at 52-53.

[122]    Plfs. Exh. 63.

- That during a meeting with the Salisbury City Council, Chief Webster commented that "shots would be fired" if the SPD were to confront a crowd of blacks.

- That Chief Webster commented to Mitri Habash that ClubVissage should change its theme from hip hop to country and western and threatened Vissage with prosecution.

The first of these incidents can be disposed of summarily.  Concerning the first, Councilwoman Lavonzella Siggers, a black woman, testified on deposition that Mayor Tilghman and her daughter accosted two city council members after a city council meeting.  According to Siggers, the mayor and the mayor's daughter "assaulted" a white man, Frank Himmelright.[123] The daughter then "assaulted" Councilwoman Polk, who is black.[124]  Siggers stated that the Chief looked on while the "assaults" took place.  Eventually, however, he stopped the altercation between the mayor's daughter and Polk.  It would be an exercise in speculation to ask a jury to determine Webster's racial attitudes from this incident.

Concerning the second incident, Siggers testified that the City Council was discussing a large, rowdy party at Salisbury University.  Someone, she said, remarked that "if that had been black people in that situation, you would have gone in shooting first and ask[ing] questions later."[125]  Siggers then testified that "it may have been the Chief or the Mayor, I'm not sure which of them or who it was that said, probably there would have been shots fired."[126]  Webster was never asked about the statement during his deposition.  There is, therefore, no proof that Webster made the statement, the import of which is equivocal in any event.

---

[123]      Plfs. Exh. 5 at 183-185.

[124]      Id.

[125]      Id. at 28.

[126]      Id. at 30.

The third incident requires more discussion, as it was the subject of extensive briefing. Mitri Habash owned a nightclub in Salisbury called Vissage.[127]  The club had different themes for different nights, such as "college night."  On Fridays, the club played hip hop music. Although Fridays were popular, they were also violent.  Fist fights frequently broke out.[128]  At some point, Habash requested a meeting with Chief Webster.  He was concerned that the police were not responding to Vissage quickly enough, and he also wanted Webster's advice on how to stop the fights from occurring in the first place.

The two met on January 17, 2003.  Webster assured Habash that the SPD was doing everything that it could do to respond promptly.  When the conversation turned to how to lessen the number of violent incidents, Webster offered several suggestions.  One was for Habash to call 911 promptly.  Another was to modify the dress code.  Yet another was to consider changing the music format from hip hop to country and western.

Habash tried tightening the dress code, shutting off the music earlier, and calling 911 at the first sign of trouble.  After the meeting, however, the problems on Friday nights persisted, including two shots fired incidents.[129]

On February 21, 2003, Elmer Davis sent Habash a warning letter regarding the club's CFS history.[130]  The letter noted that the problems at Vissage were increasing, and informed

---

[127]     On July 21, 2004, Habash filed a selective enforcement suit against Chief Webster, the City of Salisbury, and the Board of License Commissioners.  See L-04-2338 (D. Md.).  That suit is now pending.

[128]     Def. Exh. to Reply Brief at 28-30.

[129]     Id. at 46.

[130]     Habash also received one of the warning letters that Chief Webster sent to various Salisbury clubs on February 7, 2002.

Habash that the Department would "meet with the…State's Attorney regarding any action that could be undertaken."[131]  The letter closed with Davis's request for a face-to-face meeting.

Habash scheduled meetings with both Lieutenant Davis and Chief Webster.  At the meeting with Davis, Habash asked for advice on how he chould address his problems.  Among other ideas, Davis suggested that Habash change the Friday night music format.  Davis said that he had seen statistics from a Midwestern nightclub that had reduced its problems by switching its theme from hip hop to country and western.

A week later, Habash had his second meeting with Chief Webster.  Webster apparently repeated the change of format idea, referring to the same Midwestern nightclub.  According to Habash, Webster made it clear that he would not tolerate continued violence.  Habash also reported that Webster threatened him with prosecution if he renewed his liquor license.[132]

On deposition, Habash offered a number of explanations for his decision to surrender his liquor license and to close Vissage.  He said that the club was losing money because of the violence.  He stated that the frequent fights on Fridays had given the club a bad reputation, scaring away trade (primarily college students) on other nights.[133]  He said that the Board had forbidden Vissage to offer certain promotions (such as "all you can drink"), making it harder to attract customers.[134]  He acknowledged that efforts to quell the violence had proven unsuccessful, and he did not want to face possible prosecution for nuisance.[135]  Weighing all of these factors, Habash decided to surrender his liquor license and to close the club.

---

[131]     Def. Exh. 46.

[132]     Id. at 57.

[133]     Id. at 62-63.

[134]     Id. at 62.

Plaintiffs baldly assert that Chief Webster "targeted" Vissage. Habash agrees with that view, and has filed suit against Chief Webster and the City of Salisbury. That suit is pending in this Court as Habash v. City of Salisbury, et. al., L-04-2338. Discovery is underway, and the merits have yet to be tested.

Based on the record developed in the instant case, however, no reasonable jury could conclude that the interactions between Webster and Habash demonstrate a racial bias on Webster's part. The SPD never expressed concern about Vissage's hip hop night until intractable violence developed. Webster met with Habash to offer useful suggestions, a number of which Habash implemented. There is no evidence to suggest that Webster would have threatened action against Vissage had Habash succeeded in reducing the CFS to an acceptable level. Habash conceded that he could not solve his problems. It is difficult to fault Webster's position as a law enforcement officer that he would not tolerate continued violence at the club. In short, Webster's actions with respect to Vissage have none of the arbitrariness and harassment that are the hallmarks of a selective enforcement claim.

There is, therefore, simply no evidence from which a fair-minded jury could conclude that Chief Webster selectively treated Plaintiffs because of racial animus. Accordingly, the Court will dismiss Count I as to Chief Webster in his individual capacity.[136] Because the individual claim fails, the official capacity claims fail as well.[137] Accordingly, Count I is also dismissed as to the City and, therefore, in its entirety.

---

[135]   Id. at 57.

[136]   Because the Court finds that Chief Webster did not violate Plaintiffs' constitutional rights, the Court need not reach the issue whether Webster's qualified immunity would protect him from the claim.

[137]   Because the Court finds that Chief Webster did not violate Plaintiffs' constitutional rights, the City cannot be held liable on the theory that Chief Webster, a "policy maker" under

### 3.  <u>Count III: Race-Based Interference with Contract:</u>

To prove a § 1981 claim, Plaintiffs must show (1) that he is a member of a racial minority, (2) that Defendants acted with an intent to discriminate against him on the basis of race, and (3) that Defendants' race discrimination concerned Plaintiffs' "making, performance, modification, and termination of contracts," or the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." <u>See</u> <u>Morris, Inc.</u>, 89 F.3d at 413; <u>see also</u> <u>Sisk</u>, 2005 U.S. App. LEXIS 9138 at *12.

Relying on the allegations discussed above, Plaintiffs contend that the forced closure of the club severed the club's contract with promoter Mark Buffington and interfered with Plaintiffs' ability to make contracts with DJs and patrons.   Because Plaintiffs' other claims fail, their § 1981 claim must, perforce, fail as well.   There is no evidence from which a fair-minded jury could find that intentional racial discrimination on the part of the Defendants caused Andromeda to close.  <u>See</u>  <u>Denny</u>, 456 F.3d at 434.  Accordingly, the Court will dismiss Count III.

## VI.    **Supplemental Jurisdiction**

The rulings above dispose of Plaintiffs' federal claims.  The state law claims (Counts VI-V) remain.  This Court could retain the state law claims only by exercising its supplemental jurisdiction.  This case does not, however, present a compelling reason for this Court to decide claims that arise solely under state law.  Accordingly, the Court dismisses Counts VI – V.  The dismissal is without prejudice so that they may be refiled in state court if Plaintiffs so elect.  <u>See</u> 28 U.S.C. § 1367(c); <u>Revene v. Charles County Commr's</u>, 882 F.2d 870, 875 (4th Cir. 1989)

---

<u>Monell</u>, made an official policy of selectively treating the Plaintiffs because of racial animus. Nor can the City be held liable on the theory that Mayor Tilgman was deliberately indifferent to Plaintiffs' rights.  Those rights were never violated in the first place.

(holding that the district court's order "dismissing the pendent state-law claims...should have been entered without prejudice.").

**VII.   Conclusion**

For the reasons stated herein, the Court will, by separate Order, (i) GRANT Defendants' Motions for Summary Judgment, (ii) ENTER JUDGMENT in their favor, and (iii) DIRECT the Clerk to CLOSE the CASE.

Dated this _25 TH_ day of June 2007.

Benson Everett Legg
Chief Judge